# United States Court of Appeals
## For the First Circuit

No. 01-2282

CAMPANALE & SONS, INC.; C.E.H., INC.; AND
NARRAGANSETT SEAHAWK, INC.,

Plaintiffs, Appellants,

v.

DONALD L. EVANS,
SECRETARY OF COMMERCE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald L. Lagueux, U.S. District Judge]

Before

Torruella, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

Mark A. McSally, with whom Kelly, Kelleher, Reilly & Simpson was on brief, for appellants.
David J. Lazerwitz, Attorney, Appellate Section, Environment & Natural Resources Division, with whom Thomas L. Sansonetti, Assistant Attorney General, John T. Stahr, Attorney, Appellate Section, and Charles Lynch, Office of Regional Counsel, were on brief, for appellee.

November 22, 2002

**TORRUELLA**, **Circuit Judge**. This case involves regulation of one of New England's most famed resources: the American lobster. Despite the lobster's somewhat other-worldly appearance with its protruding eyes, spindly legs, and oversized claws, its meat is highly valued by epicures across the country, making the lobster fishery one of the most competitive and valuable fisheries in North America. As a result of this competition, however, American lobsters along the Atlantic Coast are overfished, jeopardizing the sustenance of the fishery. In an effort to conserve the lobster population, and pursuant to statutory authority, the Secretary of Commerce promulgated regulations that, inter alia, limited the number of lobster traps permitted per fishing vessel. Lobster fishermen who reside in and whose vessels are based in Rhode Island brought suit challenging the Secretary's regulations on various grounds. Both parties moved for summary judgment. Adopting the magistrate judge's report and recommendation, the district court granted summary judgment for the Secretary of Commerce. The lobster fishermen instituted this appeal. Because we find that the district court erred in granting summary judgment for the Secretary, we reverse.

## I.

Before delving into the merits, we first address the relevant regulatory history and the factual and procedural

background of this case, so as to provide a context for the fishermen's claims advanced on appeal.

## A. Statutory Background

### 1. <u>The Magnuson-Stevens Fishery Conservation and Management Act</u>

Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. §§ 1801 <u>et seq</u>., in 1976 to, inter alia, "take immediate action to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1). Pursuant to this goal, the Magnuson-Stevens Act established an exclusive economic zone ("EEZ"), covering the waters 3 to 200 miles offshore of the United States,[1] over which the federal government claims "sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources" located therein. <u>Id.</u> § 1811. To implement conservation measures within the EEZ, the Magnuson-Stevens Act directs the establishment of regional fishery management councils to prepare, monitor, and revise fishery management plans, "which will achieve and maintain, on a continuing basis, the optimum yield from each fisher." <u>Id.</u> § 1801(b)(4). The regional fishery management councils are designed to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and

_____

[1]  The area within three miles of shore is regulated by the individual states bordering that territory.

-3-

advise on, the establishment and administration of such [fishery management] plans" and to "take into account the social and economic needs of the States." Id. § 1801(b)(5).

Under this authority, Congress created eight regional fishery management councils (collectively "Regional Councils"), composed of state fishery officials, the National Marine Fisheries Service ("NMFS") regional director, and qualified individuals who are "knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned." Id. § 1852. A Regional Council's primary function is, for each fishery under its authority that requires conservation measures, to prepare a fishery management plan ("FMP") that establishes guidelines over the fishery and meets the conservation goals set forth in the Act. Id. § 1852(h)(1). These FMPs are prepared in response to the Secretary finding that a fishery is overfished, see id. § 1854(e)(1), and requesting conservation measures, see id. § 1854(e)(2). The Regional Council then submits the FMP to the Secretary of Commerce ("Secretary") for review. Id. § 1852(h)(1). If the FMP is approved, the Secretary is then responsible for enacting implementing regulations. 16 U.S.C. § 1854.

In sum, "[t]he Magnuson-Stevens Act's main thrust is to conserve the fisheries as a continuing resource through a mixed federal-state regime; the FMPs are proposed by state Councils but

the final regulations are promulgated by the Secretary through the Fisheries Service." Mass. v. Daley, 170 F.3d 23, 27-28 (1st Cir. 1999).

## 2.  **The Atlantic Coastal Fisheries Cooperative Management Act**

The Atlantic Coastal Fisheries Cooperative Management Act ("ACFCMA" or "Atlantic Coastal Act"), 16 U.S.C. §§ 5101 et seq., was enacted in 1993 in response to Congress' concern over "disparate, inconsistent, and intermittent State and Federal regulation that has been detrimental to the conservation" of Atlantic Coastal fishery resources. Id. § 5101(a)(3). The Atlantic Coastal Act was passed "to support and encourage the development, implementation, and enforcement of effective interstate conservation and management" of the fisheries along the Atlantic Coast. Id. § 5101(b).

Pursuant to this purpose, the ACFCMA created a new management regime, wherein:

> The responsibility for managing Atlantic coastal fisheries rests with the States, which carry out a cooperative program of fishery oversight and management through the Atlantic States Marine Fisheries Commission. It is the responsibility of the Federal Government to support such cooperative interstate management of coastal fishery resources.

Id. § 5101(a)(4). The Atlantic States Marine Fisheries Commission ("Atlantic States Commission" or "ASMFC") is composed of representatives from the states along the Atlantic Coast from Maine to Florida, as well as from the District of Columbia. Id. § 5102

-5-

(3), (13); Pub. L. No. 77-539, 56 Stat. 267 (1942); Pub. L. No. 81-721, 64 Stat. 467 (1950).

Under the Atlantic Coastal Act, the Atlantic States Commission is responsible for preparing and adopting a coastal fishery management plan ("CMP"), 16 U.S.C. § 5104(a)(1), the equivalent of the Magnuson-Stevens Act's FMP, for coastal fishery resources, which are defined as any fisheries that move among jurisdictional waters of two or more states or one state and the EEZ, id. § 5102(2). The ASMFC, in preparing CMPs, "shall consult with appropriate [Regional] Councils to determine areas where such coastal fishery management plan may complement Council fishery management plans." Id. § 5104(a)(1).

While the focus of the Atlantic Coastal Act is on state waters and coordinating plans among the coastal states and Regional Councils, the Act addresses federal and state cooperation in coastal fisheries management by providing for the development of federal regulations to support the ASMFC's coastal fisheries management efforts. See id. § 5103. Accordingly, the Act provides that, "[i]n the absence of an approved and implemented" FMP under the Magnuson-Stevens Act, and "after consultation with the appropriate [Regional] Councils, the Secretary may implement regulations to govern fishing" in the EEZ, provided that such regulations are compatible with the CMP and are consistent with the national standards of the Magnuson-Stevens Act. Id. § 5103(b)(1).

-6-

**B. Factual Background**

**1. <u>The American Lobster Fishery and Initial Conservation Efforts</u>**

American lobsters are found in coastal waters ranging from Maine to North Carolina. Although NMFS has estimated that about eighty percent of the American lobster population is located in the nearshore area (i.e., within three miles of the coast, and therefore subject to state management), the remaining twenty percent are found in the EEZ. The vast majority of lobsters are fished using lobster traps; only a few percent of those fished are caught using trawls, gillnets, dredges, or by divers.

Federal management of the American lobster began in 1978 when NMFS and the states of Maine, New Hampshire, Rhode Island, Massachusetts, Connecticut, New York, Pennsylvania, Delaware, Maryland, Virginia, and North Carolina developed a FMP pursuant to the Magnuson-Stevens Act. This effort resulted in the adoption and implementation of an Interstate Fishery Management Plan ("ISFMP") for state and federal waters. In 1983, the New England Fishery Management Council ("NEFMC"), one of the eight Regional Councils established by the Magnuson-Stevens Act, produced, and NMFS implemented, a FMP for the American lobster fishery based on the ISFMP. Despite these conservation measures, the 1993 annual report of the Northeast Stock Assessment Workshop revealed that the

American lobster stock was overfished.[2]  The increase in fishing mortality rates was attributed to increased lobster trap fishing. In 1996, a panel of independent stock assessment experts echoed the 1993 findings that the American lobster was overfished and made recommendations to curb the problem.

As a result of these studies, NMFS was concerned that the current federal conservation measures under the Magnuson-Stevens Act were insufficient to protect the lobster fishery.  Thus, on March 27, 1996, NMFS proposed withdrawing the lobster FMP as inconsistent with the national standards of the Magnuson-Stevens Act and issuing new regulations under the Atlantic Coastal Act. This suggestion prompted the development of Amendment 3 to the ISFMP and the rulemaking that is challenged in this appeal.

## 2.  **Amendment 3 to the ISFMP**

Pursuant to its authority under the Atlantic Coastal Act, the Atlantic States Commission developed and adopted Amendment 3 to the ISFMP in December 1997.  Among other measures, Amendment 3 included the following provision, limiting the number of traps per vessel allowed in the offshore region of "Area 3":

---

[2]  "Overfishing" or "overfished" is defined as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  16 U.S.C. § 1802(29).  In the lobster fishing context, overfishing occurs when the mortality rate results in an estimated egg production per lobster that is less than 10 percent of what it would be in a non-fished population.

> 3.3.3.1 <u>Limits on the number of traps per vessel</u>
> In Area 3, the Lobster Conservation Management Team, constituted under Section 3.4, shall develop a program to cap and then reduce effort, based upon historical participation, vessel size or other relevant criteria, for the purpose of achieving the egg production rebuilding schedule of Section 2.5. The program may recommend alternative measures, besides effort control, that would achieve stock rebuilding targets. The program shall be presented to the ASMFC Lobster Management Board prior to July 1, 1998; and be designed for implementation effective January 1, 1999. If a program is not forthcoming, a limit of 2,000 traps shall be implemented on January 1, 1999.

Thus, although Amendment 3 contained a trap limit, this limit was only to take effect if the Area 3 Lobster Conservation Management Team ("LCMT")[3] failed to recommend alternative conservation measures by July 1, 1998.

Meanwhile, on March 17, 1998, NMFS issued a Draft Environmental Impact Statement ("DEIS") pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 <u>et seq</u>., to evaluate alternative conservation measures for federal waters that would be compatible with those under Amendment 3. The DEIS considered a number of alternatives, including implementing

---

[3] The Area 3 Lobster Conservation Management Team was created by Amendment 3 to make recommendations on conservation measures for Area 3 to the Atlantic States Commission. Any recommendations would then be reviewed by the Commission's Lobster Management Board, and then by the Commission's Lobster Technical Committee, provided that such recommendations were submitted prior to the July 1, 1998 deadline specified in Section 3.3.3.1 of Amendment 3.

Amendment 3's trap limit and regulating offshore fishing based on historic participation. As required under NEPA, NMFS requested public comments on the alternatives in the DEIS.

On July 29, 1998, almost one month after the deadline announced by Amendment 3, the Area 3 LCMT submitted its plan to the Atlantic States Commission's Lobster Management Board. The LCMT's plan provided for trap limits based on historical participation in the lobster fishery. The Lobster Technical Committee approved the plan and forwarded it to the Lobster Management Board. The Atlantic States Commission then began consideration of the LCMT plan in April and May 1999, with plans to finish its assessment by December 1999.

## 3. NMFS' Continued Rulemaking Under the Atlantic Coastal Act

While the LCMT was developing its recommendation to the Atlantic States Commission, NMFS continued its efforts to develop regulations governing the EEZ that would be compatible with the measures applicable to state waters and recommended for federal waters under Amendment 3. On January 15, 1999, after consideration of the public comments received on its DEIS, NMFS published its proposed rule in the Federal Register.

The proposed rule recommended setting trap limits of 2,000 in 1999 and 1,800 in 2000 for the offshore area. As the Area 3 LCMT plan had not yet been approved by the Atlantic States Commission at this time, NMFS did not include the historic

-10-

participation plan in its proposed rule. The public comment period for the proposed rule ran from January 11, 1999 to February 26, 1999.

On May 10, 1999, NMFS published the Final Environmental Impact Statement ("FEIS"). At this time, the Atlantic States Commission had just completed public hearings on the LCMT plan, but had still not yet approved the plan.

## 4. Adoption of the LCMT Plan and NMFS' Second Rulemaking

On August 3, 1999, more than one year after the deadline set out in Amendment 3, the Atlantic States Commission finally approved the LCMT plan for trap limits based on historic participation and recommended that NMFS implement the substance of the LCMT plan.

Based on this recommendation, NMFS promulgated a notice of new proposed rulemaking on September 1, 1999, which included the possibility that future conservation measures could be based in part on historical participation in the lobster fishery. While NMFS began this new separate rulemaking process based on historic participation it simultaneously continued the rulemaking process establishing flat trap limits pursuant to the Atlantic States Commission's recommendations in Amendment 3.[4]

---

[4] NMFS opted not to include the LCMT plan in the rulemaking process that it had already begun because it would have had to start the rulemaking process afresh, meaning that no plan would be able to go into effect until this new process was completed. The course of the rulemaking for this process was estimated by the

## 5.  NMFS' Final Rule and On-going Rulemaking on the LCMT Plan

On December 6, 1999, NMFS published the final rule withdrawing the FMP for the American lobster and establishing federal regulations under the Atlantic Coastal Act, which included the flat trap limit set forth in the proposed rule.  These regulations were scheduled to take effect on May 1, 2000.  The relevant part of the promulgated regulations concerning offshore Area 3 provide:

> **§ 697.19 Trap limits and trap tag requirements for vessels fishing with traps.**
> .........
> (b) Trap limits for vessels fishing or authorized to fish in the EEZ Offshore Management Area.
> (1) Beginning January 5, 2000, through April 30, 2000, vessels fishing only EEZ Offshore Management Area 3, or, fishing only EEZ Offshore Management Area 3 and the Area 2/3 Overlap, shall not fish with, deploy in, possess in, or haul back from such area more than 2,000 traps.
> (2) Beginning May 1, 2000, vessels fishing only in or issued a management area designation certificate or valid limited access American lobster permit specifying only EEZ Offshore Management Area 3, or, specifying only EEZ Offshore Management Area 3 and the Area 2/3 Overlap, shall not fish with, deploy in, possess in, or haul back from such area more than 1,800 traps.

50 C.F.R. § 697.19.

---

defendant-appellee to last one to two years.  NMFS stated that "continued delay for full consideration of the LCMT plans until a date yet to be determined by the Atlantic States Commission jeopardizes needed management measures to protect the lobster resource."

Despite this final rule, NMFS indicated that it was still pursuing the LCMT plan under a separate on-going rulemaking process.  Accordingly, on December 10, 1999, NMFS published a Notice of Intent to Prepare an Environmental Impact Statement for the LCMT plan and requested written comments.  NMFS also published a supplemental DEIS and held public hearings in four states.  As a result of the comment process, on January 3, 2002, NMFS issued a proposed rule based on the LCMT's historic participation plan.  If this proposed rule were adopted, it would replace the trap limit set forth in the final rule that is challenged in this appeal.[5]

## C.  Procedural Background

Plaintiffs-appellants in the three underlying consolidated cases are American lobster fishermen and lobster business owners or shareholders, who all reside in or whose vessels are berthed in Rhode Island.  On January 4 and 5, 2000, the three sets of plaintiffs filed complaints in the United States District Court for the District of Rhode Island, challenging the Secretary of Commerce's promulgation of the December 6, 1999 final rule imposing the trap limits.  Plaintiffs asserted that the final rule violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701

---

[5]  The fact that the Secretary is currently promulgating a rule that follows the recommendation of the Council does not mean that he followed the proper procedure for the rule that is subject to litigation.  It actually might show prejudice, because if the Secretary had consulted with the councils regarding the litigated rule, perhaps he never would have passed it, but instead would have adopted a historic participation model as he is doing now.

-13-

et seq., various provisions of the Atlantic Coastal Act, the Magnuson-Stevens Act, and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 et seq. Plaintiffs sought a declaratory judgment that the final rule was arbitrary and capricious and specific relief ordering the Secretary to implement a trap limit regulation based on historic participation.

After the defendant, the Secretary of Commerce, filed his answer on April 11, 2000, the plaintiffs filed a consolidated motion for summary judgment on October 20, 2000. The Secretary filed an opposition motion and a cross-motion for summary judgment. The district court then referred the case to a magistrate judge for preliminary review, findings, and recommended disposition. On May 4, 2001, after a hearing on the cross-motions for summary judgment, the magistrate judge issued a Report and Recommendation to the district court recommending that the court grant the Secretary's motion for summary judgment and deny the plaintiffs' motion. Plaintiffs filed timely objections to the magistrate judge's report.

On August 7, 2001, the district court accepted the magistrate judge's report and recommendation and granted summary judgment in favor of the Secretary in the three consolidated cases. On September 6, 2001, plaintiffs in one of the three underlying suits, Campanale & Sons, Inc., C.E.H., Inc., and Narrangansett Seahawk, Inc. (collectively "appellants"), filed a notice of appeal

from the district court's final judgment.  Appellants seek review of only four of the claims that were presented to the district court: (1) the Atlantic Coastal Act's "consultation" requirement; (2) compliance with the Magnuson-Stevens Act's national standard 2; (3) compliance with national standard 8; and (4) alleged violation of the RFA.

## II.

This Court reviews de novo a district court's grant of summary judgment.  See Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).  In this case, since appellants allege violations of the Atlantic Coastal Act, the precise standard of review is provided by the APA, 5 U.S.C. §§ 701 et seq.  See Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1284 (1st Cir. 1996) (applying APA standard of review to agency action under federal statute which does not itself specify a standard of review); see also 16 U.S.C. §§ 5101 et seq. (not discussing judicial review for ACFCMA).

Under the APA's standard of review, this Court can set aside agency action only if we determine such action to be "arbitrary, capricious, an abuse of discretion," or "without observance of procedure required by law," or otherwise contrary to law.  See 5 U.S.C. § 706(2)(A)-(D); see also Associated Fisheries, 127 F.3d at 109.  When the issue is whether the agency followed the requisite legal procedure, our review is limited, but exacting.

See Natural Res. Def. Council, Inc. v. Sec. & Exch. Comm'n, 606 F.2d 1031, 1045, 1048-49 (D.C. Cir. 1979). We review only to determine whether "statutorily prescribed procedures have been followed." Id. at 1045. Thus, despite applying a de novo standard, our review is narrow. See id.; see also Mass. v. Daley, 170 F.3d 23, 28 (1st Cir. 1999) ("[N]ominally reviewing the decision de novo but effectively reviewing the Secretary's action under the APA").

In exercising our review of the district court's grant of summary judgment for defendant, we determine whether the summary judgment record shows that there is no genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). In so doing, we must view the record evidence in the light most favorable to the non-moving party. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

## III.

Appellants assert that the district court erred in concluding that the Secretary satisfied the "consultation" requirement of the Atlantic Coastal Act. The Atlantic Coastal Act, in relevant part, provides, "[i]n the absence of an approved and implemented fishery management plan under the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), and after consultation with the appropriate Councils, the Secretary

-16-

may implement regulations to govern fishing in the exclusive economic zone," as long as such regulations are "compatible with the effective implementation of a coastal fishery management plan" and "consistent with the national standards" of the Magnuson-Stevens Act. 16 U.S.C. § 5103(b)(1) (emphasis added).[6] The ACFCMA does not define "consultation."[7]

Appellants contend that the "after consultation with the appropriate Councils" language requires the Secretary (or NMFS, as his designee) to consult with the relevant Regional Councils, the New England Fishery Management Council ("NEFMC") and the Mid-Atlantic Fishery Management Council ("MAFMC"), before he is permitted to implement regulations affecting the EEZ under the Atlantic Coastal Act. As a result, appellants assert that issuing regulations without first consulting these councils constitutes an agency action "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), warranting the regulations to be set aside. Although appellants concede that the administrative record contains

---

[6] We note that the Atlantic Coastal Act, a specific law, overrides a more general law such as the APA.

[7] The dissent analogizes to other cases in which we have held that the National Historic Preservation Act and NEPA require only that the agency be informed of and consider various alternative positions. Those statutes, however, lack the specific consultation language found in the Atlantic Coastal Act. The Atlantic Coastal Act requires the Secretary to consult with the Regional Councils because they are presumed to have expertise that the Secretary does not. It therefore makes sense to impose a greater duty of consultation in these cases because the Secretary may not otherwise be fully informed.

some correspondence between these councils and NMFS, appellants argue that these letters were merely part of the public comment process for agency rulemaking and did not constitute "consultation" within the meaning of the Atlantic Coastal Act. Moreover, appellants assert that any correspondence that did occur between the councils and the Secretary was insufficient for consultation because it occurred after the Secretary had already made decisions and recommendations regarding the regulations.

The district court, rejecting the appellants' argument that the Secretary implemented regulations without "consultation," granted summary judgment in favor of the defendant. The court found that there was "sufficient evidence in the Record that NEFMC and MAFMC gave their opinions or at least were afforded the opportunity by NMFS to give their opinions on the proposed regulations." Ace Lobster Co., Inc. v. Evans, 165 F. Supp. 2d 148, 172 (D.R.I. 2001). The evidence relied upon by the court was the following: the FEIS was sent to the Executive Directors of NEFMC and MAFMC; NMFS received public comments on the DEIS, some of which were from NEFMC and MAFMC; and five comments on the DEIS were authored in part by the NEFMC, to which NMFS responded directly. Id. at 171. The court bolstered its conclusion that this correspondence satisfied the consultation requirement by reasoning that "the underlying statutory ideology of the ACFCMA--that of state-influenced management of the lobster resource supported by

the Federal government--is not offended by the perhaps less than exhaustive 'consultation' with NEFMC and MAFMC (neither of which are state-managed bodies)." Id. at 172. We disagree with the court's conclusion that the evidence, viewed in the light most favorable to appellants, sufficiently demonstrated consultation so as to warrant summary judgment.

Our general rules of statutory interpretation dictate a narrow course for us on review: unless the statutory language is ambiguous, we generally are limited by its plain meaning. See Herman v. Héctor I. Nieves Transp., Inc., 244 F.3d 32, 34 (1st Cir. 2001); see also Boivin v. Black, 225 F.3d 36, 40 (1st Cir. 2000) ("We assume that the words that Congress chose to implement its wishes, if not specifically defined, carry their ordinary meaning and accurately express Congress' intent."). In this case, there is no ambiguity: "consultation" means what consultation ordinarily means. See Black's Law Dictionary 311 (7th ed. 1999) (defining consultation as "[t]he act of asking the advice or opinion of someone").

The gravamen of the district court's error in finding sufficient evidence of "consultation" is that it relied solely upon correspondence that was part of a general public comment process statutorily required by NEPA, rather than by the ACFCMA. See 42 U.S.C. § 4332 (requiring environmental impact statements to accompany "every recommendation or report on proposals for

-19-

legislation and other major Federal actions significantly affecting the quality of the human environment" and to be made available to the public). Thus, the cited correspondence between NMFS and NEFMC or MAFMC did not differ from NMFS' correspondence with the general public. Under NEPA, the FEIS was required to be made available to the public at large, so the fact that NEFMC and MAFMC were provided with a copy was simply part of this obligation. Moreover, when NEFMC and MAFMC proffered public comments to the DEIS, they were acting no differently than other members of the public who are given an opportunity to respond to environmental impact statements under NEPA. Consultation, within the parameters of the Atlantic Coastal Act, must mean something more than general participation in the public comment process on environmental impact statements, otherwise the consultation requirement would be rendered nugatory.[8] See Héctor I. Nieves Transp., 244 F.3d at 36 ("A primary canon of statutory construction is that a statute should be construed so as not to render any of its phrases superfluous.").

The Secretary, anticipating this argument, counters that commentary by NEFMC or MAFMC, made as part of the NEPA process, can

_____

[8] There is no evidence to support the dissent's view that the consultation language is simply meant as a "fail-safe." Where the statutory language is clear, it is not the role of the judiciary to substitute its judgment for that of Congress. Here, Congress specifically inserted a requirement to consult with the Agencies. If Congress so intended, it could have easily explained that this consultation was only necessary if the Secretary was not required to release an EIS under NEPA.

-20-

still constitute consultation under the Atlantic Coastal Act. The Secretary contends that the ACFCMA "does not require that [] consultation occur through a distinct process or provide that it cannot be combined with other statutory or regulatory processes." Although the Secretary offers no legal support for this proposition, we agree with the Secretary's position as a theoretical matter; in some circumstances, consultation that occurs pursuant to NEPA's requirements may also fulfill the Atlantic Coastal Act's requirement of consultation.[9] However, this is not such a case.

Here, the comments made pursuant to NEPA and upon which the district court relied are insufficient to satisfy the ACFCMA's consultation requirement. NEPA was created, in part, "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321 (establishing congressional purpose of NEPA). In view of this goal, NEPA requires that the public be given an opportunity for public comment, see 42 U.S.C. § 4332, to help ensure that the government is aware of and has considered all significant environmental effects in formulating its proposed action. Cf. Conservation Law Found., Inc. v. Busey, 79 F.3d 1250,

---

[9] Contrary to the dissent's assertion, we do not claim that the requirements under NEPA and the Atlantic Coastal Act are redundant. We agree that in some situations the two can be handled together. Here, however, additional consultation was required by the Atlantic Coastal Act, the paramount applicable statute.

1271 (1st Cir. 1996) (commenting that NEPA is designed to force government decision makers to consider environmental impact); Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1021 (9th Cir. 1980) (noting purpose of input under NEPA is "to further the statutory purpose of encouraging widespread discussion and consideration of the environmental risks and remedies associated with the pending project.").

The ACFCMA, however, is more specifically designed "to support and encourage the development, implementation, and enforcement of effective interstate conservation and management of Atlantic coastal fishery resources." 16 U.S.C. § 5101(b). Although in some circumstances the goals of preventing environmental damage under NEPA and conserving Atlantic coastal fishery resources under the ACFCMA may coalesce, they are not always synonymous. As a result, public comments made by one of the Regional Councils in response to an environmental impact statement under NEPA may not raise the same issues that the same council would raise when consulting with the Secretary under the ACFCMA about proposed regulations governing fishing in the EEZ. Thus, without notice to the NEFMC or MAFMC that the Secretary was intending to use their comments to the DEIS or FEIS to fulfill the consultation requirement of the ACFCMA, the councils may not have appropriately tailored their environmental comments to correspond with advice they would have offered the Secretary under the

ACFCMA.[10]  In this case, the Secretary did not provide any such notice to the Regional Councils.  Thus, it was inappropriate for the district court to rely on the DEIS/FEIS public comments as showing that NEFMC and MAFMC "were afforded the opportunity by NMFS to give their opinions on the proposed regulations."  Although the councils were given the opportunity to offer their environmental assessments of the proposed regulations, the documents relied upon by the district court do not demonstrate that NMFS solicited the councils' advice regarding the soundness of the regulations for conserving Atlantic Coastal fishery resources.[11]

However, even if the district court erred in relying on the environmental impact statement commentary as sufficient evidence of consultation, we can still affirm the district court's judgment if there are other grounds evident in the record to support the court's finding of consultation.  See Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  The Secretary points to a number of documents as supporting his

---

[10]  We are not engrafting a notice requirement onto the ACFCMA. Rather, we are suggesting that the Secretary might satisfy both NEPA and the Atlantic Coastal Act by providing notice that the DEIS is meant to elicit all comments from the councils.

[11]  Furthermore, while the Secretary may have been aware that the councils preferred trap limits based on historic participation, there is no evidence that NMFS understood the reasons for this preference.

-23-

claim that NMFS properly consulted NEFMC and MAFMC.[12] While some of these documents do show correspondence between NMFS and NEFMC and/or MAFMC, many involve general discussions about management of the lobster fishery rather than specific views about the proposed conservation measures for the EEZ. Moreover, although the administrative record arguably does indicate that NMFS kept NEFMC informed of its intent to withdraw the lobster FMP and instead regulate under the Atlantic Coastal Act, NMFS never requested

_____

[12] The dissent finds that nine documents between NMFS and the New England Council demonstrate sufficient consultation for purposes of the Atlantic Coastal Act. We find this evidence insufficient.

Items 1-4, 5 and 7 concern a discussions of the FMP that was in place until March 1996. The Council was fighting to maintain the existing FMP, while NMFS proposed to amend or withdraw it. Item 8 simply alerted the Council that NMFS would withdraw the FMP and proceed under the Atlantic Coastal Act.

Item 6 references a meeting regarding a "stock assessment" and the biology and productivity of American lobster. There is nothing to suggest this meeting discussed the FMP or any new regulations.

Thus, until March 1996, all relevant discussion had concerned whether to amend the FMP or withdraw it. No alternative regulations had been proposed. These general correspondence are not applicable to whether or not NMFS consulted with the Council before implementing the challenged rule. It was not until NMFS announced that the FMP would be withdrawn and regulations would be imposed under the Atlantic Coastal Act that the Act, and its consultation requirement, even came into play.

The first time NMFS announced its proposed alternatives was in the DEIS, released March 17, 1998. Item 9 is the Council's response to the publicly released DEIS, and the first time the Council expressed its preference for a historic participation model. This public commentary is the only possible "consultation" because it is the only time the Council was responding to specific proposed regulations.

-24-

NEFMC's or MAFMC's opinion or advice regarding this intent, but merely stated that NMFS "will keep [NEFMC] informed." The Secretary does not proffer any evidence in the administrative record where NMFS affirmatively solicits advice or an opinion from the Regional Councils regarding its proposed regulations.[13]

Even after our independent review of the lengthy administrative record in this case, we are unable to find any evidence that NMFS "ask[ed] the advice or opinion" of NEFMC or MAFMC, or afforded them a proper opportunity to express their opinions, regarding the proposed rule. Although we agree with the district court that ACFCMA "is not offended by . . . perhaps less than exhaustive 'consultation' with NEFMC and MAFMC," there must be some effort by NMFS to receive the councils' views regarding proposed regulations over Atlantic Coastal fishery resources and then consider such advice. Consultation with the relevant councils is key in the Secretary's development of effective regulations because the councils have valuable expertise and insight. See 16 U.S.C. §§ 1852(h)(3) (requiring the councils to conduct public hearings "to allow all interested persons an opportunity to be heard in the development of fishery management plans"), 1852(h)(5)

---

[13] This court has the discretion to consider the issue of harmlessness sua sponte and to overlook the parties' failure to argue it. See United States v. Shea, 159 F.3d 37, 40 (1st Cir. 1998). However, we do not believe that this case is an appropriate one in which to exercise that discretion. The harmlessness inquiry here is a factual one, and one we think best undertaken initially by the district court.

(requiring councils to review and revise assessments of the optimum yield from each fishery), 1852(b)(2)(A) (requiring that council members be qualified by expertise regarding conservation and management of fishery resources). Without some communication between NMFS and the councils to elicit such expertise, the consultation requirement is meaningless.[14]

We rule that there is insufficient evidence in the record to show that the Secretary complied with Congress' explicit procedural requirement to consult with the appropriate councils before implementing regulations governing fishing in the EEZ.

---

[14] The dissent argues that "at least some deference is owed the agency's view that it has engaged in consultation [because] Congress has left it to the Secretary to reasonably construe 'consultation' [and] deference is also owed agencies due to their 'specialized experience.'" These statements, although correct as generalities, hardly fit the circumstances of this appeal. We are unaware of any line of cases that allows an agency to make a binding determination that it has complied with specific requirements of the law. Although the agency can in the first instance conclude that it has engaged in consultation, this self-serving conclusion cannot be the end of judicial inquiry if a party properly makes a challenge, as has happened in this case. See 5 U.S.C. § 706 (providing for judicial review of agency actions). As to the so-called "specialized experience" of the agency, it would appear that it is the courts that qualify for such a title on an issue of legislative interpretation. Interpretation of the word "consult" is purely a legal question for the courts. See 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law [and] interpret . . . statutory provisions"). Using traditional methods of statutory construction, we hold that the agency did not adequately consult with the Councils, as required by statute. Such a legal determination does not require deference to the agency. See INS v. Cardoza-Fonseca, 480 U.S. 421, 446 (1987); accord Grinspoon v. Drug Enforcement Admin., 828 F.2d 881, 885 (1st Cir. 1987) (interpreting a statute without deference to the agency's interpretation).

Thus, we reverse the district court's grant of summary judgment for defendant and remand for further proceedings consistent with this opinion.[15]

## IV.

Because we find that the summary judgment record on the consultation issue, viewed in the light most favorable to appellants, does not support judgment as a matter of law for defendant, we **reverse** and **remand** the case for further proceedings consistent with this opinion.

### "**Dissent follows**"

---

[15] Because we reverse summary judgment on the consultation issue, which may be determinative of whether the regulations will be set aside under 5 U.S.C. § 706(2)(D), we need not address the appellants' remaining claims.

**LYNCH**, <u>**Circuit Judge**</u> **(Dissenting)**.  Despite my respect for my colleagues, I dissent.  By any definition the Secretary has engaged in "consultation": he sought comments from the Council on the very point at issue (a possible rule based on historic participation), received them in writing, and responded in writing. The majority says this exchange does not count because the Secretary did so in the course of receiving public comments on a draft Environmental Impact Statement (DEIS) under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370 (2000). The majority argues that if this did count as consultation, that would make the separate consultation requirement of 16 U.S.C. § 5103(b)(1) (2000) redundant, and Congress does not enact superfluous provisions.  With respect, the majority is, in my view, quite wrong in its ruling on statutory interpretation.

The majority also argues that even if there were no redundancy, further consultation is required, but does not say why. In fact, the two statutes cover similar concerns -- including both economic and environmental considerations -- and there is no need for further consultation.

Moreover, even if the majority's statutory interpretation is correct, there is still the question of whether the plaintiffs have demonstrated prejudicial error under 5 U.S.C. § 706 (2000) or are entitled to any relief.  The district court should address these issues on remand.

The majority holds that the Secretary cannot meet his obligation to consult with the New England Council under § 5103(b)(1) by giving notice of proposed alternative approaches to the lobster overfishing problem to the Council, receiving commentary from the Council, and responding to those comments because he did so in the course of meeting NEPA requirements. The majority reaches this holding because it believes that the consultation requirement would otherwise be rendered redundant. That is not so.

The majority's reasoning necessarily rests on the premise that in all situations the consultation requirement of § 5103(b)(1) would be rendered redundant if an agency could be said to have consulted under ACFCMA by complying with the notice and comment requirements under NEPA for a DEIS. That premise -- that the universe of regulation under ACFCMA and NEPA are perfectly congruent, like circles atop each other -- is fallacious, as shown below. In many circumstances there is no overlap and no possible redundancy.

ACFCMA, 16 U.S.C. §§ 5101-5108 (2000), authorizes the Atlantic States Marine Fisheries Commission to develop coastal management plans. Id. § 5104(a). Plans adopted by the Commission may not be implemented by the Secretary until "after consultation with the appropriate Councils." Id. § 5103(b)(1). The strictures

of NEPA require that a federal agency issue an environmental impact statement (EIS) only for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C) (2000).  If the proposed action would not have a significant effect on the environment, the agency need not produce an EIS.  See 40 C.F.R. §§ 1501.4(e), 1508.9(a)(1) (2001).

Given that there was a separate requirement of notice and opportunity to comment under NEPA, it is fair to ask why Congress imposed a consultation requirement in ACFCMA.  The most plausible reading is that Congress wished to assure that if consultation did not occur in the process of meeting other regulatory requirements, there would be consultation with the councils in any event.  The consultation requirement is a fail-safe.

There may well be situations in which that fail-safe is needed.  The majority itself notes one such situation: when the DEIS does not cover the subject matter of the proposed regulation on which there should be consultation with the council.  The majority thus refutes its own logic, which rests on a claim of redundancy.  Another example is when the Secretary's proposed regulation does not require issuance of a DEIS, because the regulation would not have a significant effect on the environment.  A third is when the Secretary does not, in the course of the DEIS, give specific notice to the councils and they, ignorant of the opportunity, do not comment.  The circles of regulatory scope of

ACFCMA and NEPA do not sit atop each other, but instead constitute a Venn diagram, with only partial overlap. The lack of contiguity between the regulatory schemes eliminates the redundancy argument upon which the entire logic of the majority opinion rests.

Furthermore, that portions of the NEPA and ACFCMA regulatory regimes may overlap does not create an objectionable redundancy. A great many systems have redundancy built in, just to provide an additional fail-safe. No one considers those redundant systems to be superfluous; they are there for a purpose.

Rather, it is the majority's opinion which will create a duplication of effort which is contrary to congressional intent. Congress surely prefers agencies to be efficient and avoid unnecessary procedural steps. That is the thrust of the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 (2000), among many other laws. See, e.g., Paperwork Reduction Act of 1995, 44 U.S.C. §§ 3501-3521 (2000). Congress also prefers, as NEPA itself says, that the agencies try to coordinate and administer in a coherent fashion their various environmental responsibilities. See 42 U.S.C. § 4332. Yet the majority opinion holds that the Secretary must meet his obligation to consult with the New England Council about the best way to protect lobsters and the lobster fishery in a separate procedure totally apart from the public procedure of DEIS comments on the possible alternative solutions to the very same problem of lobster overfishing. On these facts, the majority's

requirement that there be a separate procedure of consultation creates redundancy, inefficiency, and delay. See Coalition for Lower Beaufort County v. Alexander, 434 F. Supp. 293, 295 (D.D.C. 1977) (NEPA "was not intended to create a bureaucratic nightmare in which form rather than substance governs").

That is a bad outcome in any situation. It is a particularly bad outcome where Congress has specifically retooled regulation in the area of fisheries through ACFCMA, taking power away from the councils in order to make the regulatory system speedier and more efficient. Further detail on this regulatory background is set forth as Appendix A. And even worse, the majority's outcome introduces delay into the very process Congress tried to place on a fast track: the protection of the lobster fishery.[16]

The statute does not, contrary to the majority, prohibit the Secretary from complying with the consultation requirement of ACFCMA and the notice and hearing requirements of NEPA at the same time. Congress would applaud such initiative. The agency here did not engage in empty formalisms. It specifically sent the various

---

[16] In September 1996, Congress passed fisheries legislation that established new general procedures for the revocation of an FMP, but which recognized the urgency of the lobster overfishing problem. The new provision exempted only the lobster FMP, by name, from the new requirements. See Sustainable Fisheries Act of 1996, Pub. L. No. 104-297, § 109(i), 110 Stat. 3587, 3587 (1996). This congressional action advanced the Secretary's goal of transferring authority over lobster management from the Council to the Commission.

regulatory options to the Council, received pertinent comments, and responded to them. The historic participation model for trap limits, the very plan plaintiffs now claim was not the subject of consultation, was among the alternatives included in the DEIS. This communication satisfied the policy concerns behind both ACFCMA's consultation requirement and NEPA's EIS requirement.

The majority, in footnote nine, attempts to avoid the weakness of its redundancy logic by saying that it does not really rely on redundancy, but that the requirements of ACFCMA and NEPA could not be handled together because "some additional consultation was required." The majority does not explain why. It certainly cannot be that there was no opportunity for the Council to comment on material issues during the course of its NEPA response. First, § 5103(b)(1) does not require that the Secretary consult with the councils on particular specific matters. In fact, under § 5103(b), the only requirement for valid consultation is that it occur before the regulation in question is implemented. Second, the majority may mistakenly assume in footnote nine, without any analysis, that there was no consultation on the economic impact of the purported regulation. This, in turn, rests on the erroneous assumptions that: (a) NEPA commentary does not address economic impact, and (b) NEPA commentators are precluded from discussing economic impact. Both assumptions are wrong as a matter of law. Both assumptions are factually untrue.

The purpose of the EIS under NEPA is very similar to the purpose of the ACFCMA consultation requirement: "[T]he EIS helps . . . to ensure that the agency takes a 'hard look' at the environmental consequences of its proposed action and to make information on the environmental consequences available to the public, which may then offer its insight to assist the agency's decision-making through the comment process." DuBois v. United States Dept. of Agric., 102 F.3d 1273, 1285-86 (1st Cir. 1996). Where the policies promoted by the requirements under ACFCMA and NEPA -- "consultation" and "notice and comment" -- are so similar, it makes sense for the agency to handle them together. Moreover, the path the agency took had the added benefit that the public could see the Council's comments and the Secretary's response. There was no "consultation" behind closed doors or at an obscure meeting.

While one purpose of NEPA and its EIS requirements is environmental protection, another is to strike a balance between that protection and economic productivity. See 42 U.S.C. § 4321 (describing the purposes of NEPA as including "encourag[ing] productive and enjoyable harmony between man and his environment"). Similarly, environmental impact statements must address "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity."

-34-

§ 4332(C)(iv). In short, the nature of NEPA's provisions addresses economic as well as environmental factors.

Here, as a matter of fact, the Council was on notice that the lobster fishery DEIS and request for comments put economic considerations on the table. The DEIS issued by the agency, in its opening paragraphs, made this clear: "The DEIS considers the biological and economic effects of several alternative actions for waters under federal jurisdiction" (emphasis added).

Even had the DEIS not made the breadth of issues open for comment so explicit, there is no restriction on the subject matter or content of comments made to an agency issuing an EIS. The Council was free to respond to the DEIS however it wished. Further economic concerns were relevant in the response.

The majority attempts to justify its result by saying that it is required by the plain meaning of the statute. That is a red herring. The majority's reasoning rests not on plain meaning but on a supposed redundancy between two statutes (a redundancy that does not exist) or a supposed preclusion of economic commentary (a preclusion that does not exist).

Even if plain meaning were somehow at issue, the disagreement really is not about a dictionary definition of "consultation." The dispute is about which of the very many ways there are of eliciting the views of others amounts to the sort of

"consultation" Congress intended. On this point, there is ambiguity and the statute does not tell us the answer.

The statutory text containing the "consultation" requirement is clear in certain respects. It is clear that the "consultation" need take place only before "implementation" of the regulation; section 5103(b)(1) imposes no other constraints on when consultation can take place. Any consultation between the agency and the councils on the subject addressed by the proposed regulations would meet the strictures of § 5103(b)(1), then, even if that consultation took place before formal notice of the proposed rule. The long-running communication between the Secretary and the Council, summarized in Appendix B, demonstrates just this sort of pre-implementation consultation.

The statute is also clear that there is no separate notice provision requiring that the Secretary announce that he is "consulting" with the councils or that the councils be informed of exactly how the Secretary plans to meet the consultation requirement. Courts are not free to engraft additional procedural requirements onto § 5103(b)(1) when Congress has not done so. Cf. Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 545 (1978) (prohibiting judicial additions to the procedural requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, 701-706 (2000)). By creating a requirement that the agency give separate notice to the councils

that the DEIS comment period is meant to meet the parallel ACFCMA consultation requirement as well, the majority makes precisely this error.

When analyzing similar, though not identical, language in other statutes that are designed to produce informed decisionmaking, this court has required only that the agency be informed of and consider various alternatives or positions.  In our NEPA decisions this court has said that the court's substantive role is "only to assure itself that the agency has given good faith consideration to the environmental consequences of its actions and should not pass judgment on the balance struck by the agency among competing concerns."  Roosevelt Campobello Int'l Park Comm'n v. United States Envtl. Prot. Agency, 684 F.2d 1041, 1045 (1st Cir. 1982); see Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983); see also Save Our Heritage, Inc. v. Fed. Aviation Admin., 269 F.3d 49, 58 (1st Cir. 2001) (the National Historic Preservation Act (NHPA) "imposes both a substantive obligation to weigh effects . . . and a procedural obligation to consult"); DuBois, 102 F.3d at 1284 ("'NEPA does not mandate particular results'; it 'simply prescribes the necessary process.'") (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); Robertson, 490 U.S. at  350 ("If the adverse environmental effects . . . are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that

-37-

other values outweigh the environmental costs."); <u>Vermont Yankee</u>, 435 U.S. at 558 (Congress, in enacting NEPA, meant only "to insure a fully informed and well-considered decision"). The analogous additional procedural requirements of ACFCMA, then, are designed only to ensure that an agency takes particular factors into consideration when making decisions. That has surely been done here.

Finally, for two different reasons, at least some deference is owed to the agency's view that it has engaged in consultation. First, Congress has left it to the Secretary to reasonably construe "consultation." ACFCMA on this point is in contrast with NHPA, 16 U.S.C. § 407f. Under NHPA, Congress empowered the Advisory Council on Historic Preservation to promulgate rigorous procedural rules governing the consultation process. <u>Id.</u> § 470s. The actual consultation process under NHPA has not been left up to the individual agencies but has been codified by regulation. 36 C.F.R. Part 800 (2001). Here, by contrast, the regional councils have not been given any formal power to determine the structure or content of the consultation process. Given the counter-example of NHPA and Congress's choice not to pursue a similar path under ACFCMA in § 5103(b)(1), Congress apparently intended that the Secretary here be permitted to determine the appropriate consultation procedures (subject to the

underlying APA constraint that the interpretation not be arbitrary and capricious).

Deference is also owed agencies due to their "specialized experience." Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944); see United States v. Mead Corp., 533 U.S. 218, 234-39 (2001) (applying Skidmore deference). The consultation requirement of § 5103(b)(1) is not a generalized procedural hurdle; it requires that the Secretary consult with a particular set of organizations with which the agency is intimately familiar. The Secretary was presumably aware of how best to consult with the regional councils regarding fishery regulation. He consulted with the New England Council over a period of many years, as described in Appendix B, and we should accept his entirely reasonable determination that this consultation was adequate under ACFCMA.

The Secretary's regulation of the lobster fishery is taking place on two tracks, one slightly in advance of the other. In addition to the rule now being challenged, the Secretary has proposed, received comments on, but not yet adopted a new replacement rule which follows the historic participation model for setting trap limits. See American Lobster Fishery, 67 Fed. Reg. 282 (proposed Jan. 3, 2002) (to be codified at 50 C.F.R. Part 697); see also Extension of Comment Period, 67 Fed. Reg. 4697 (Jan. 31, 2002) (extending comment period on proposed historic participation rule until Feb. 28, 2002). This is the model that plaintiffs in

the present case prefer. The proposed rule should be made final soon, the comment period having closed over seven months ago. The Secretary's version of a historic participation model works out many technical details that were incomplete when the rule challenged in this litigation was proposed. The consideration of this proposed rule again shows that consultation took place and the Council's concerns were heard. Presumably implementation of a historic participation rule will moot this appeal.

**II.**

This court has discretion to determine the harmlessness of the error, although neither side has briefed the issue to us. United States v. Shea, 159 F.3d 37, 40 (1st Cir. 1998) (harmlessness can be raised sua sponte); United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997) (same); see Save Our Heritage, 269 F.3d at 61 (applying harmless error sua sponte in an administrative review context); Moulton v. Rival Co., 116 F.3d 22, 26 (1st Cir. 1997) (applying harmless error analysis in a civil context). The majority opinion chooses not to exercise that discretion, preferring to remand the issue to the district court.

Some reference to the common standards in the area may be of assistance on remand. Judicial review of agency rulemaking is not directly analogous to judicial review of an agency adjudication:

> A judicial determination that an agency erred
> in the process of adopting a new policy does

> not necessarily mean that the status quo ante
> -- the agency's old policy -- is superior to
> the agency's new policy. Frequently, the
> basis for setting aside the new policy is
> remote from the central purpose and basis of
> the new policy. Yet, judicial review of the
> agency rulemaking process is so demanding that
> the process of policymaking on remand from a
> court decision reversing an agency decision
> usually requires many years. If the new
> policy is superior to the old policy, the
> public can suffer significant harm
> attributable to the years of delay.

1 R.J. Pierce Jr., Administrative Law Treatise, § 7.13 (4th ed. 2002).

This is one reason that the APA instructs a reviewing court to consider whether the alleged error caused actual prejudice. See 5 U.S.C. § 706 (mandating that when a court reviews an agency action, "due account shall be taken of the rule of prejudicial error"). The burden is on the plaintiffs to show such prejudice. See Air Canada v. Dep't of Transp., 148 F.3d 1142, 1156 (D.C. Cir. 1998); see also Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 102 (1st Cir. 1997) ("In a civil case, the party asserting error bears the burden of demonstrating that the error was harmful . . . .").

Our court and others have interpreted this APA requirement as a harmless error rule, and have refused to grant relief when a procedural error in the regulatory process (or an alleged one) did not produce a different result for the plaintiff. See, e.g., Save Our Heritage, 269 F.3d at 61-63 (finding agency's

-41-

alleged failure to consult under NHPA was harmless error where impact on historic site was de minimis); First Am. Discount Corp. v. Commodity Futures Trading Comm'n, 222 F.3d 1008, 1015-16 (D.C. Cir. 2000) (holding failure to provide notice and seek comments on alternative compliance mechanism was harmless error where plaintiff had invoked that mechanism); Sierra Club v. Slater, 120 F.3d 623, 637 (6th Cir. 1997) (finding error in notice harmless because a "notice requirement was functionally satisfied" through other means).

Further, even if the Secretary had erred by failing to consult and even if the error were prejudicial to plaintiffs, that still would not lead to vacating the regulation. It is in the reviewing court's sound discretion to remand a rule to an agency to mend procedural defects without overturning it in its entirety. See Cent. Me. Power Co. v. Fed. Energy Regulatory Comm'n, 252 F.3d 34, 48 (1st Cir. 2001) (declining to enjoin regulation while case remanded to agency for further explanation); Sugar Cane Growers Coop. of Fla. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (remanding rule that violated notice and comment requirements without vacating it because of chaotic practical consequences of vacating); United Mine Workers v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 967 (D.C. Cir. 1990) ("Relevant to the choice are the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed.").

The district court should also consider this issue on remand.

## III.

Because I differ with the majority's holding, I respectfully dissent.

A.  Statutory Context

        The Secretary's regulation of federal waters is meant to be done in coordination with the states' regulation of their own coastal waters.  The original model was one established by the Magnuson-Stevens Act.  16 U.S.C. §§ 1801-1883 (2000).  That statute, first enacted in 1976, see Fishery Management and Conservation Act, Pub. L. No. 94-265, 90 Stat. 331 (1976), established eight regional councils, including the New England Council, composed of representatives of various stakeholders, such as state regulators, industry, environmentalists, and academics. Id. § 1852(a)(1).  The Magnuson-Stevens regime established a complex relationship between the Secretary and the regional councils which afforded the latter considerable power.  For example, while it was the Secretary who determined that a particular aquatic species needed conservation measures to stop overfishing, it was the council that then developed the fishery management plan (FMP) in response, which the Secretary, through his designee the National Marine Fisheries Service (NMFS), either approved or disapproved.  Id. § 1852(h).  Not surprisingly, this process was cumbersome and diffused authority too much.

        In response, Congress enacted the Atlantic Coastal Fisheries Cooperative Management Act (ACFCMA) in 1993.  Pub. L. No. 103-206, Title VIII, §§ 801-811, 107 Stat. 2419, 2447 (1993).  It is that statute which we interpret.  The ACFCMA relied on the Atlantic States Marine Fisheries Commission ("Atlantic States Commission" or "Commission"), an organization more closely controlled by state governments, to play a more active role in the process of developing regulation over fisheries in federal waters.[17] See 16 U.S.C. § 5101(a)(4).  According to the Secretary, some members of the New England Council also sit on the Atlantic States Commission.

---

[17]  The Atlantic States Commission was formed originally by a congressionally-approved interstate compact in 1942.  See Pub. L. No. 77-539, 56 Stat. 267 (1942).  It is composed of three representatives from each state on the eastern seaboard (as well as the District of Columbia):  a state legislator, the head of the state agency responsible for fishery management, and a gubernatorial nominee with "knowledge of and interest in the marine fisheries problem."  See id. at Art. III.

Under the ACFCMA, the Atlantic States Commission now develops its own management plans for Atlantic waters, called coastal management plans (CMPs), which are distinct from the FMPs developed by regional councils. See 16 U.S.C. § 5104(a)(1) (authorizing Atlantic States Commission to "prepare and adopt coastal fisheries management plans to provide for the conservation of coastal fisheries resources"). In preparing a CMP, the Atlantic States Commission in turn consults with the appropriate regional councils. Id. The statute did not disband the regional councils on the east coast, but it did reduce their power over regulation in the EEZ. The Secretary now has the authority to work principally through the Commission when developing new regulations for the EEZ. See 16 U.S.C. § 5103. The regulations promulgated under that authority are subject to the conditions that give rise to the disputes in this case.

B. Regulatory Process Leading to the Challenged Rule

The regulatory process which resulted in the challenged regulations took a period of years; we view it as starting before 1995. The need for more aggressive action to preserve the Atlantic lobster fishery has been evident since at least 1993, when a report revealed that the American lobster stock was overfished.[18] That finding was reinforced by a lobster stock assessment in 1996. On September 30, 1997, the NMFS placed the American lobster on a list of overfished fisheries.

Prior to that, in July of 1995, the New England Council had corresponded with the NMFS and various states, attempting to get all to agree in concept, before there were any public hearings about it, to the lobster management strategy developed by the Council's Effort Management Teams (EMTs). The NMFS responded that the staff of the two groups had already been involved together in the development of lobster management plans by EMTs, that many of the states had declined to participate in the Council's proposed process, and that the agency would therefore consider using its power under ACFCMA and withdrawing the New England Council's lobster FMP.

The Secretary then published an advance notice of proposed rulemaking (ANPR), indicating that NMFS was considering such a process under the ACFCMA and asking for comments. See

_____

[18] Attempting to address the same lobster overfishing problem, the New England Council had also amended its FMP for the American lobster seven times from 1986 to 1999. The Secretary corresponded with the Council about the adequacy of these amendments.

Advance Notice of Proposed Rulemaking, 60 Fed. Reg. 48,086 (Sept. 18, 1995). The ANPR explained that acting under ACFCMA "would remove management responsibility for the lobster fishery from the [New England] Council's purview," although the resulting regulations could incorporate ideas from the Council's EMT plans. One affected state responded that it preferred the rulemaking to be transferred to the Atlantic States Commission from the New England Council. On February 23, 1996, the NMFS informed the New England Council in a letter that it intended to shift rulemaking for the American lobster in the EEZ to the Atlantic States Commission, and that it would encourage the Commission to come up with a more definite lobster fisheries plan. A month later, the NMFS announced its initial determination that it would withdraw approval of the New England Council's FMP for American lobster and, in order to see that the fishery more closely complied with state administrative programs, issue regulations formulated through the Atlantic States Commission under ACFCMA. See American Lobster Fishery; Removal of Regulations, 61 Fed. Reg. 13,478 (Mar. 27, 1996).

In September 1996, Congress passed fisheries legislation that established new general procedures for the revocation of an FMP, but which recognized the urgency of the lobster overfishing problem by making it easier for the Secretary to withdraw approval of the lobster FMP. The new provision exempted only the lobster FMP, by name, from the new requirements. See Sustainable Fisheries Act of 1996, Pub. L. No. 104-297, § 109(i), 110 Stat. 3587 (1996). This congressional action advanced the Secretary's goal of transferring authority over lobster management from the Council to the Commission.

Prompted by the Secretary's actions, the Atlantic States Commission began to develop a plan for the conservation of the American lobster fishery. In December 1997, the Commission approved Amendment 3 to its Interstate Fishery Management Plan. The Amendment established an advisory group (the Lobster Conservation Management Team or "LCMT"), including plaintiff Campanale and Sons, Inc. ("Campanale") and other industry representatives, to recommend a lobster management plan based on historic participation. Amendment 3 also included a uniform limit of 2000 traps as a default measure that would take effect unless the LCMT came up with an alternate plan by certain deadlines.

In furtherance of Amendment 3, on March 17, 1998 NMFS issued a draft environmental impact statement ("DEIS") pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370 (2000). The DEIS sought to evaluate alternative management measures for federal waters that would be compatible with the measures developed under Amendment 3. Among the alternatives, the

DEIS expressly considered: maintaining the status quo (Alternative 1); implementing Amendment 3's default limitation of 2000 traps (Alternative 2); implementing a nearshore/offshore trap cap differential, with a buffer zone, and continuing existing management measures (Alternative 3); a two-tier nearshore and offshore trap limit with a buffer zone (Alternative 4); nearshore uniform trap limits and offshore limits set by historic participation (Alternative 5); and banning fishing for and possession of lobsters (Alternative 6). As required under NEPA, NMFS requested public comments on the alternatives set forth in the DEIS. See Council on Environmental Quality NEPA Regulations, 40 C.F.R. Pts. 1502, 1503 (2002) (explaining EIS and public comment process). A number of public hearings were also held on the DEIS in the various states that participate in the lobster fishery.

The New England Council was specifically sent the DEIS so that it could comment. The DEIS also itself referred to prior interactions between NMFS and the New England Council on the matter. The DEIS noted that the New England Council, when it was revising its FMP, had missed the deadline for adopting a plan and had not reached a "final agreement" on specific measures to prevent lobster overfishing. The New England Council did respond to the DEIS and indicated its support for an alternative based on historic participation rather than a uniform flat trap limit.

On May 10, 1999, the Secretary issued a Final Environmental Impact Statement (FEIS), which reflected comments that had been received, including those from the New England Council. The Council had commented that in selected management areas it supported a historic participation trap limit. The Secretary responded that this approach had also been proposed through the LCMT as part of the Commission's deliberations and was the specific subject of hearings to be held by the Commission in May of 1999. The response also supported an industry-wide evaluation by the Commission "on the merits of historic participation."

The LCMT and the Atlantic States Commission did not meet the deadlines set in Amendment 3 for development of the historic participation rule. That, in turn, created an obligation for the Secretary to come up with at least an interim rule. The flat trap limit rule that was adopted, and is the subject of this lawsuit, was compatible with the default limit of 2000 traps set by the Commission in Amendment 3.

The Secretary proposed the challenged rule in January 1999. At that time the Commission still had not completed a viable historic participation rule. The Secretary delayed publication of

a final rule, giving the Atlantic States Commission yet more time to act.  The Secretary finally promulgated the rule, implementing a flat trap limit consistent with the Commission's default measure, in December 1999.  <u>See</u> American Lobster Fishery, 64 Fed. Reg. 68,228 (Dec. 6, 1999) (to be codified at 50 C.F.R. Part 697).

## Appendix B: Secretary's "Consultation" Actions

Arguing that he did consult, the Secretary points to a number of documents (including documents which reflect staff level communication between the Secretary and the New England Council), to the comments submitted by the New England Council in response to the DEIS, and finally to the involvement of the Atlantic States Commission, on which members of the regional councils sit. Taken together, these interactions satisfied the "consultation" requirement of § 5103(b)(1), as the Secretary contends:

1). A 1994 letter from NMFS to the New England Council concerning approval and disapproval of some FMP amendments that the Council had proposed, and warning that the Secretary might withdraw approval of the FMP and promulgate new rules through the Atlantic States Commission "under the Atlantic Coastal Act."

2). Letters sent in July 1995 by the New England Council to state regulators and to the NMFS regional director, Andrew Rosenberg, seeking to get them all to agree in concept to the Council's lobster strategy, based on the EMT plans, before public hearings about it that fall.

3). A response letter, dated August 9, 1995, from Rosenberg to the New England Council. Rosenberg says that NMFS staff had already been involved in development of the EMT plans, and had raised their "[ l]egal and enforcement concerns" in that process. He goes on to note the "recent letters from the states opting out of this cooperative effort" -- apparently referring to state regulators' responses to the Council's July 1995 inquiries. As a result, Rosenberg concludes, the NMFS "must now reevaluate its options which include amending the plan by Secretarial action or withdrawing the lobster FMP." That is, the NMFS would need to consider either (1) imposing changes under the Magnuson-Stevens Act, or (2) using the Secretary's power under ACFCMA and withdrawing the FMP. (The second option is what the agency ultimately pursued).

4). A September 8, 1995 e-mail message from an NMFS official describing Rosenberg's participation in an August 1995 meeting of the New England Council where he reiterated the contents of his letter.

5). The September 1995 ANPR announcing the proposal to withdraw the FMP and proceed under ACFCMA, as well as an internal NMFS memo by Rosenberg preparing for this notice.

6). A September 27, 1995 memo from Rosenberg concerning his participation in a September 1995 meeting of the New England Council about the timing of the lobster stock assessment.

7). An October 24, 1995 letter from the New England Council to Rosenberg. The letter accepts that it may be appropriate to develop a lobster plan with the Commission as "the lead fishery management institution" and the New England Council playing a supporting role in a "joint planning process."

8). A letter dated February 23, 1996 from the Director of the NMFS to the New England Council, which informs the Council that the NMFS plans to publish a proposed rule in the Federal Register withdrawing the lobster FMP and replacing it with regulations developed under ACFCMA in cooperation with the Commission.

9). The comments submitted by the New England Council in response to the DEIS, which are described in the FEIS and set forth in the main text of the dissent.

Some of this interaction cited by the Secretary occurred in 1995 and 1996, a few years before the challenged rule was proposed in January 1999. But the statute does not contain any requirement about when the consultation take place, other than that it must be before implementation of the rule. In fact, the earlier dialogue was an important part of a lengthy process of coming to a rule, a process which culminated in a proposed rule in 1999 and an implemented rule in 2000.